## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COEUR ROCHESTER, INC. )
104 S. Michigan Ave., #900 )
Chicago, Il 60603 )
 )
   Plaintiff, )
 )  Case No. _____
v. )
 )
DAN BROUILLETTE, in his official capacity )
as Secretary of Energy, )
1000 Independence Ave. SW )
Washington, DC 20585 )
 )
and )
 )
U.S. DEPARTMENT OF ENERGY )
1000 Independence Ave. SW )
Washington, DC 20585 )
 )
   Defendants. )

### COMPLAINT FOR REVIEW AND INJUNCTION UNDER THE
### ADMINISTRATIVE PROCEDURE ACT

1. Certain industries produce mercury as an unavoidable byproduct of their operations, and the

United States has not developed a domestic capacity for permanent disposal of that mercury.  In

2008, the Mercury Export Ban Act ("MEBA") prohibited the export of elemental mercury, effective

at the beginning of 2013.  MEBA directed the Department of Energy ("DOE," "Department") to

provide a facility for the "long-term management and storage of elemental mercury generated within

the United States." Pub. L. 110-414, 122 Stat. 4344 (Oct. 14, 2008) (codified at 15 U.S.C. § 2611(c)

& 42 U.S.C. § 6939f).  The Department missed multiple deadlines, and over a decade later it still had

not developed that facility.  Now, racing to beat the final deadline of January 1, 2020, the

Department has attempted to implement the MEBA storage obligation through a rulemaking and

contract that are irrational, far too costly (at the expense of generators of mercury), contrary to the

statute, and contrary to federal procurement rules.  In its haste, the Department also violated

fundamental procedural requirements under the Administrative Procedure Act ("APA"), with the

result that its rule contains multiple avoidable errors.  The Department's last-minute process has

produced a rule, and a facility, that is contrary to the principles of sound government, invalid, and

due to be vacated.

2.   The Department's rule and its facility must be put on hold pending the Court's final decision

on those matters.  As things stand, generators, including the plaintiff in this case, are obligated

(under Section 5(g)(2)(B)of MEBA) to send to the Department the mercury that they have

accumulated during the long wait for the Department to comply with its MEBA duties.  Hundreds

of tons of elemental mercury will be loaded onto trucks and begin criss-crossing the country to

arrive at the Department's storage facility.  Generators are also obligated, along with those

shipments, to pay the Department the excessive, unreasonable fee that it established through its last-

minute rulemaking.  When the Court finally determines that plaintiff is correct, it will be too late to

undo all those actions.  That the Department waited until the last weeks of 2019 to carry out the task

Congress assigned it in 2008 is no reason for the generators to be rushed into compliance with the

Department's improper plans.

### Parties

3.   Plaintiff Coeur Rochester, Inc. ("Coeur Rochester" or "Coeur") is a wholly-owned

subsidiary of Coeur Mining, Inc., that owns and operates the Rochester Mine in Pershing County,

Nevada.  Coeur Rochester began mining operations in 1986 and has a best-in-class safety and

environmental record.  Coeur Rochester is headquartered in Chicago, Illinois, with its main

operations in Pershing County, Nevada.

4.   Defendant U.S. Department of Energy ("Department," "DOE") is an agency of the U.S.

Government, an executive department that carries out multiple missions related to national energy

policy, nuclear weapons development and safety, science and technology research, and environmental management regarding the legacy of nuclear development.  The Department is charged under MEBA to develop a facility for the long-term management and storage of domestically generated elemental mercury, and to accept custody of such mercury.  The Department is headquartered at 1000 Independence Avenue SW, Washington, DC.

5.   Defendant Dan Brouillette is the Secretary of Energy ("Secretary"), the officer of the U.S. Government who heads the Department.  He is sued in his official capacity as Secretary.  His principal office is at the Department's headquarters in Washington, D.C.

## Jurisdiction and Venue

6.   This Court has jurisdiction under 28 U.S.C. § 1331, because the plaintiff lays claims under the APA, 5 U.S.C. § 551 *et seq.*, which arise under federal law.

7.   The government has waived its sovereign immunity with respect to this suit, because the claims request only injunctive and declaratory relief and not money damages.  5 U.S.C. § 702.

8.   This Court is a proper venue for the case because the defendants, an officer and an agency of the United States, reside in this district; and because policy decisions of DOE officials at the Department's headquarters in this district form a substantial part of the events giving rise to Coeur's claims.  28 U.S.C. § 1391(e)(1).

## Background

### The Mercury Export Ban Act

9.   Mercury is a naturally occurring chemical element, atomic number 80, found in many rocks and minerals.  Elemental mercury is a metal that is liquid at room temperature and atmospheric pressure.  At room temperature, it can also evaporate; mercury vapor is invisible and odorless.

10. Elemental mercury historically had many uses, such as in thermometers, electrical switches, batteries, and various chemical processes.

11. Myriad compounds of mercury are also known, including mercuric chloride, mercuric sulfide, and organic compounds such as methylmercury.  Mercuric chloride has been used as a photographic agent, as a wood preservative, and as a fungicide.  Mercuric sulfide was historically used as a bright red paint pigment.  Methylmercury is a byproduct that forms from vapors of mercury and from inorganic mercury compounds in the environment.

12. Elemental mercury and its compounds are generally highly toxic, causing adverse effects to human and animal neurological systems, renal systems, and more.  Given these toxicities, many uses of mercury and its compounds have ceased, partly in response to regulatory mandates.

13. Certain industries unavoidably generate mercury in various forms.  Particularly relevant here, many gold and silver mining operations produce mercury incidentally from the beneficiation or processing of ores that naturally contain mercury.  In those ores, mercury is bound up in the mineral matrix with the gold or silver in minerals, and part of the process of extracting gold or silver is the separation of the valuable metals from the mercury.  Coeur Rochester has, in recent years, produced about 11 metric tons of elemental mercury each year.

14. In 2008, Congress determined that although use of elemental mercury was declining in the United States, in many other countries the use of elemental mercury continued.  Pub. L. 110-414, § 2, 122 Stat. 4341.  These worldwide uses presented risks to health and environment in the United States because mercury is a transboundary pollutant.  *Id.*  To impede foreign uses of mercury, Congress prohibited (with certain narrow exceptions) "the export of elemental mercury from the United States," beginning in January 2013.  *Id.* § 4, 122 Stat. 4342 (amending section 12 of the Toxic Substances Control Act, 15 U.S.C. § 2611).

15. MEBA left domestic generators of elemental mercury without an obvious mechanism for handling their byproduct material, because there was no facility in the United States authorized to dispose of elemental mercury.  There remains no such facility.  Before MEBA, generators could

send elemental mercury to facilities in Canada or other countries that can dispose of it. MEBA foreclosed that possibility. Generators can still have their byproduct mercury treated into a mercury-containing compound, the export of which MEBA would not prohibit, and send that material for disposal in Canada or elsewhere outside the United States. That process is costly and presents its own difficulties.

16. To provide a safe management alternative, in MEBA Congress mandated that the Department designate one or more of its facilities "for the purpose of long-term management and storage of elemental mercury generated within the United States." Pub. L. 110-414, § 5(a)(1), 122 Stat. 4344 (codified at 42 U.S.C. § 6939f(a)). MEBA required that DOE designate the storage facility by January 1, 2010, and that the facility be "operational" by January 1, 2013, and begin at that time to "accept custody, for the purpose of long-term management and storage, of elemental mercury generated within the United States and delivered to such facility." *Id.* § 5(a)(1)-(2).

17. MEBA instructed the Department to recover certain costs from the generators of mercury. "After consultation with persons who are likely to deliver elemental mercury to a designated facility for long-term management and storage under the program prescribed in subsection (a), and with other interested persons, the Secretary shall assess and collect a fee at the time of delivery for providing such management and storage, based on the pro rata cost of long-term management and storage of elemental mercury delivered to the facility." *Id.* § 5(b)(1). MEBA required the Department to establish the fee by October 1, 2012. *Id.* § 5(b)(1)(A).

18. MEBA describes and limits the components of the Department's storage fee.

> "The costs referred to . . . are the costs to the Department of Energy of providing such management and storage, including facility operation and maintenance, security, monitoring, reporting, personnel, administration, inspections, training, fire suppression, closure, and other costs required for compliance with applicable law. Such costs shall not include costs associated with land acquisition or permitting of a designated facility under the Solid Waste Disposal Act or other applicable law. Building design and building construction costs shall only be included to the extent that the Secretary finds that the management and storage of elemental mercury

accepted under the program under this section cannot be accomplished without construction of a new building or buildings." *Id.* § 5(b)(2).

19. In general, elemental mercury that is waste material is regulated as a hazardous waste under the Solid Waste Disposal Act, 42 U.S.C. § 6901 *et seq.* Until the U.S. Environmental Protection Agency ("EPA") approves a treatment and land disposal method for mercury, land disposal of mercury in the US is prohibited. Ordinarily, "the storage of such hazardous waste is prohibited unless such storage is solely for the purpose of the accumulation of such quantities of hazardous waste as are necessary to facilitate proper recovery, treatment or disposal." 42 U.S.C. § 6924(j). MEBA exempted from this restriction the mercury "that the Secretary is storing on a long-term basis." Pub. L. 110-414, § 5(g)(2)(A).

20. MEBA also provided a limited exemption for commercial storage of elemental mercury pending the Department's development of its storage facility. At an appropriately permitted facility, mercury may be stored, and is exempt from the Solid Waste Disposal Act's storage restriction, if the Department "is unable to accept the mercury at a facility designated by the Secretary under subsection (a) for reasons beyond the control of the owner or operator of the permitted facility," and the facility's operator "certifies in writing to the Secretary that it will ship the mercury to the designated facility when the Secretary is able to accept the mercury." *Id.* § 5(g)(2)(B). (The operator must also promise not to sell the mercury in the meantime. *Id.*)

**DOE Delays**

21. In 2009, the Department issued guidance informing mercury generators what it expected to use as the standards for mercury it would accept at its eventual long-term storage facility. Among other criteria, the Department indicated that material would need to be 99.5% pure elemental mercury. U.S. Dep't of Energy Office of Envt'l Mgmt., "U.S. Department of Energy Interim Guidance on Packaging, Transportation, Receipt, Management, and Long-Term Storage of Elemental Mercury," p. 1-5  (Nov. 13, 2009).

22.  In January 2011, the Department published an environmental impact statement ("EIS")
evaluating plans for long-term mercury storage.  The 2011 EIS identified a site in west Texas run by
Waste Control Specialists, LLC ("Waste Control Specialists" and the "WCS Site") as the preferred
alternative.

23.  The Department did not follow the 2011 EIS with an actual decision at the time to use the
WCS Site.  It also did not, at that time, issue a contract acquiring the facility or storage services from
Waste Control Specialists.  Nor did DOE issue a request for proposals initiating a bidding process to
identify other potential storage contractors.

24.  In 2013, the Department prepared a supplemental EIS evaluating three additional
alternatives, each involving the construction of a new facility near the Department's Waste Isolation
Pilot Plant in Carlsbad, New Mexico.

25.  By 2016, the Department still had not developed or designated a long-term storage facility.
And it had issued no proposal regarding the fees that generators would pay.

26.  Congress amended MEBA in 2016 to address the Department's long delay.  The
amendments set a new deadline for the Department to establish the fees: October 1, 2018.  Pub. L.
114-182, tit. I, § 10(c), 130 Stat. 480 (codified at 42 U.S.C. § 6939f(b)(1)(B)).  The amendments also
set a new deadline for the facility to be operational.  If it was not running by January 1, 2019, the
Department was required to subtract from the fees the amounts that generators have been paying
for temporary storage while they wait for the facility.  42 U.S.C. § 6939f(b)(1)(B)(iv).

27.  Further, in case the Department still continued to delay, Congress established an additional
deadline and consequence.  The amendments allowed mining companies to store mercury on-site
(not only at permitted storage facilities), so long as they provided certifications similar to those
needed for off-site temporary storage.  *Id.* § 6939f(g)(2)(D).  MEBA now also mandates that if the
Department's mercury-storage facility is not "operational" by January 1, 2020, the Department must

take title to such on-site mercury that has been accumulated up to that point; pay for storage in a permitted facility until the Department's long-term storage facility is available; and then pay to deliver the mercury to that facility.  *Id.* § 6939f(b)(1)(C).

28.  The Department still did not develop its facility or establish the fees for storage.  It was not until May 2018 that the Department first undertook consultation with mercury generators and waste experts about the fee, as required under MEBA.  At that meeting, DOE representatives suggested that the cost of long-term storage might be as high as $250,000 per metric ton of mercury.  Industry participants objected that this assessment was wildly unrealistic and inconsistent with the principles of sensible cost estimation.

29.  In August 2018, the Department continued the consultation with another meeting, at which it again suggested a figure of $125,000 to $250,000 per metric ton.  This figure was apparently based on an estimated cost of $1,500 per metric ton per year, projected over 1,000 years at a discount rate of 0.6% (below what the Office of Management and Budget recommends for even near-term projects, and far below what any sensible 1,000-year projection would use as a discount rate).

30.  At this point, the Department still had not designated its facility or entered into a contract to acquire or operate the facility.  In July 2018, the Department had finally begun to explore, by requesting "expression[s] of interest," what companies would potentially be interested in doing such work if it requested proposals.  Dep't of Energy, Envt'l Mgmt. Consolidated Bus. Ctr., "Expression of Interest for Long-Term Storage and Management of Elemental Mercury Services," p.1 ("EOI Request").  The EOI Request made clear that it was not soliciting proposals and was not itself the beginning of a procurement process.  The document also stated that companies responding should avoid including any proprietary business information in their responses, and the Department reserved the right to use the submitted information for any purpose.

31. Three companies responded that they were interested in providing a facility and services for long-term storage of elemental mercury.

32. In September 2018, the Department held another meeting with industry representatives, at which it said it expected to conduct a competitive bid process for the facility and projected a Request for Proposals would be issued in December 2018 or January 2019 and a contract awarded in May 2019.

33. By the beginning of 2019, the Department still had not designated a facility, contracted to acquire a facility, or issued even a proposed rule regarding the fees for storage.  It did not publish a Request for Proposals to initiate a competitive bidding process regarding long-term mercury storage. Instead, on January 17, 2019, it requested a proposal solely from Waste Control Specialists.

34. In June 2019, the Department wrote a supplemental EIS updating the Department's assessment of the environmental impacts of storing mercury at a DOE facility for 40 years.  The 2019 supplemental EIS did not assess the consequences of any particular level of fees, or of disposing of the mercury after some period of storage (whether 40 years or some other time).  The supplemental EIS provided information about the mercury that has been accumulated for delivery as soon as the facility is operational, and it provided the Department's forecasts for mercury that will be generated and delivered in coming years.  The Department did not publish the supplemental EIS.

35. By September 30, 2019, the end of fiscal year 2018, the Department still had taken no action to designate or operate the MEBA facility and no action to set the fee that generators will pay.

**DOE's Last-Minute Rush**

36. On October 4, 2019 (over a year after the rescheduled deadline for finalizing the fee), the Department finally took steps toward establishing the fee by publishing a notice of proposed rulemaking.  84 Fed. Reg. 53,066 (Oct. 4, 2019) ("NPRM").  The Department proposed a fee of $55,100 per metric ton of mercury, plus a fixed fee of $3,250 per shipment.

37. The NPRM was deeply flawed.  Among other problems, it contained basic economic and mathematical errors.  For example, the Department assumed that the cost of storage will increase 3.5% each year, and it summed up those escalating amounts to generate a portion of the storage fee, without recognizing that the present value today of an amount ten years from now is lower, rather than higher.  Guidance from the Office of Management and Budget ("OMB") about cost estimation has long made clear how to calculate present values properly.  The Department also double-counted the inflation for a separate cost component, transportation, which it assumed will increase by both the 3.5% rate and by an additional 1.3% rate that the Department based (incorrectly) on a OMB document meant for a different sort of analysis.

38. The NPRM estimated that storage, by itself, costs $810 per metric ton per year.  It provided no data to support that estimate; the NPRM said the cost was "based on pricing from commercial vendors" but provided no further information.  The Department also proposed to establish a removal charge of $376 per metric ton and a receiving charge of $3,250 per shipment, based, again, on unexplained "pricing from commercial vendors."

39. The NPRM further asserted that transporting mercury from the storage facility to an eventual disposal facility will cost $1,230 per metric ton.  The Department said this cost is "based on the current transportation cost of elemental mercury from generators' sites in Nevada to long-term RCRA-permitted storage facilities," but it provided no further information—what generators are paying that amount, to what facilities, on what terms, or anything else.  This estimated transportation cost was wildly excessive compared to actual commercial pricing.

40. The NPRM also said the Department would expect to store mercury for 15 years and would then dispose of the mercury; and the Department would charge generators, at delivery of their mercury, for the cost of that eventual disposal.  The NPRM cited a cost of $37,900 per metric ton for treatment and disposal.  The Department said this cost was "based on preliminary pricing from a

U.S. commercial vendor and includes all DOE costs associated with treatment and disposal." It specifically noted that those costs include "DOE's cost for treatment, DOE's cost for transportation to a disposal site and DOE's cost for disposal"; thus the Department double-counted the cost of transportation. Yet the NPRM provided no further information about these combined treatment, transportation, and disposal costs.

41. The consequences of the fee rule for mercury generators are significant. Coeur has accumulated about 64 metric tons of mercury that will require storage. The Department's proposed fee would cost Coeur an immediate charge of over $3.5 million, amounting to nearly 10% of the net financial results of Coeur's parent company Coeur Mining, Inc., for 2018. Other large generators would face similar costs under the proposed rule. The additional cost of $55,100 per metric ton of mercury generated in the future is also substantial, and vastly greater than what generators currently pay for storage.

42. Given the importance of the rule to mercury generators—a dynamic of which the Department is well aware given the active engagement of industry in the Department's 2018 consultations—and the need for generators to supplement the scant information the Department provided, a generous comment period was warranted. Instead, the Department allowed only three weeks, with comments due on October 25, 2019. In an October 16, 2019 letter to the Department, Coeur asked for an extension, but the Department did not respond.

43. Coeur also pointed out, in that letter, that the Department had not provided important supporting information that is required for an APA rulemaking. The Department provided no response to that letter.

44. Coeur submitted extensive comments pointing out various defects in the proposal. So did several other mercury generators and trade groups with generators among their members.

45. Meanwhile, the Department did not issue a Request for Proposals and did not issue a contract for the facility.

46. On December 6, 2019—26 days before the January 1, 2020 deadline—the Department published a Record of Decision designating the WCS Site, consisting of buildings belonging to Waste Control Specialists in Andrews, Texas, as the DOE mercury storage facility. *Record of Decision for the Long-Term Management and Storage of Elemental Mercury*, 84 Fed. Reg. 66,890 (Dec. 6, 2019) ("Designation"). The Designation stated that DOE would use "an existing Basic Ordering Agreement with WCS," which would "simplif[y] the procurement process and allow[] DOE to mitigate some of the liabilities associated with the incentives added to MEBA" by the 2016 amendments. *Id.* at 66,892 col. 3.

47. On December 10, 2019—22 days before the deadline—the Department announced it had issued a task order (referred to herein as the "Task Order") to Waste Control Specialists to "lease . . . storage space as a DOE facility" for mercury storage "of up to 6,800 metric tons." U.S. Dep't of Energy Office of Envt'l Mgmt., Press Release, "DOE Awards Task Order for Elemental Mercury Long-Term Management and Storage" (Dec. 10, 2019), at https://www.energy.gov/em/articles/ doe-awards-task-order-elemental-mercury-long-term-management-and-storage.

48. The Department has not disclosed the Task Order or the associated lease, or provided any other information about the prices it had agreed to pay Waste Control Specialists.

49. On December 23, 2019—9 days before the deadline—the Department finally published a rule (the "Fee Rule") establishing the fee for mercury storage. *Elemental Mercury Management and Storage Fees*, 84 Fed. Reg. 70,402 (Dec. 23, 2019). Illustrating the Department's haste, the Fee Rule did not go through review by OMB pursuant to Executive Order 12,866. The NPRM had stated that it was a "significant regulatory action" subject to such review. 84 Fed. Reg. at 53,067. But the Fee Rule said the opposite, with no explanation for the about-face. 84 Fed. Reg. at 70,409.

50. On December 27, 2019—4 days before the deadline—the Department announced that its contract with Waste Control Specialists was actually "a lease and services agreement . . . for management and storage of elemental mercury delivered to the facility." U.S. Dep't of Energy Office of Envt'l Mgmt., Press Release, "DOE Issues Final Rule on Fee for Long-term Management and Storage of Elemental Mercury" (Dec. 27, 2019), at https://www.energy.gov/em/articles/doe-issues-final-rule-fee-long-term-management-and-storage-elemental-mercury.  This announcement indicated that on that very day state regulators had approved an amendment to Waste Control Specialists' permits to allow long-term mercury storage.  The announcement invited mercury generators to deliver mercury to the facility.

### The Fee Rule Is Invalid

51. The Fee Rule reflects multiple errors of mathematics and economics, ignores key issues, and perpetuates without consideration numerous legal flaws that commenters had detailed in public comments.  The haphazard discussion in the preamble reflects the hurried process through which the Department developed the rule.

52. The Fee Rule sets a fee of $37,000 per metric ton.

53. Of that total, $12,500 represents the cost per metric ton of receiving the mercury, storing it for 15 years, and then transporting it for treatment and disposal.  84 Fed. Reg. at 70,403.  This figure is arbitrary and capricious for multiple reasons.  Among other flaws, it is based on inconsistent reasoning.  For example, the Department asserts that the costs for receiving mercury include unloading the mercury from a truck, moving it to its storage location, checking its compliance with the Waste Acceptance Criteria, and "purchasing required materials" such as racks for holding the flasks of mercury.  Meanwhile the costs for removing mercury are the costs for removing it from storage, loading it on a truck, and then logging the shipment.  No "required materials" are to be

purchased at removal.  84 Fed. Reg. at 70,406.  Yet, inexplicably, the receiving and removal costs are identical, both $570 per metric ton.

54. As another example, the Department now explains that the cost for generators' transportation of mercury was based on information that some generators pay "approximately $1,000 for a shipment of up to 15 MT" from Nevada to Alabama for storage.  84 Fed. Reg. at 70,406.  Logically, the cost for shipping one metric ton would be one fifteenth of that amount, or approximately $67.  Indeed, for some other costs, the Department calculated the pro rata charge per metric ton.  Yet the Fee Rule inexplicably includes a transportation charge of $1,000 *per metric ton*— the full amount of the asserted cost for shipping 15 metric tons, rather than the proportionate per-ton share.

55. The Department has repeatedly estimated that it will store nearly 7,000 metric tons of mercury.  For example, its December 10 press release said its lease will be for storage of up to 6,800 metric tons.  Yet the Fee Rule allocated the various costs pro rata across an "initial contracted inventory of 1,206 MT."  The rule gave no explanation for why the initial inventory would be 1,206 metric tons; the June 2019 supplemental EIS had said that the initial inventory would be 1,560 metric tons and that DOE's National Nuclear Security Administration, on its own, has 1,206 metric tons to be stored.  The rule also gave no explanation of why it would be appropriate to apportion costs over only the initial contracted amount when, over most of the 15 years of projected storage, the Department is expecting to store an amount five times larger.  Of course, allocating the costs pro rata across a smaller quantity yields a higher storage fee.

56. Furthermore, the Department's calculation of the pro rata amount was simply incorrect. The Department stated an annual lease cost of $30,234.42, to be allocated (it said) over 1,206 metric tons.  Dividing the first by the second yields $25.07 per metric ton.  The Fee Rule inexplicably states that the result of the calculation is $300.84 per metric ton, and further calculations in the Fee Rule

use that incorrect figure.  And if the annual lease costs were allocated across the estimated eventual inventory of 6,800 metric tons, the cost per metric ton would be $4.47, far less than the $300.84 figure that the Department used for each year.

57. Commenters responding to the NPRM pointed out that the proposed estimate of $1,500 per metric ton for storage was far higher than other available storage sources, such as the Department of Defense facility in Hawthorne, Nevada, which stores elemental mercury at an average cost of about $80 per metric ton.  The same is true of the Department's reduced estimate of $810 per metric ton; yet the Department's explanation for the 10-fold difference is inadequate and irrational.  The Department said the difference was due to the fact that the Hawthorne facility is not subject to the Solid Waste Disposal Act, but the Department did not identify any protective or compliance measures that this statute imposes and that the Defense Department is not doing at its facility.  The Department certainly did not identify any such differences that would cause a 10-fold difference in cost.

58. The Department also said its facility will be more costly because the mercury to be stored is coming from sources more varied than those sending mercury to the Hawthorne facility.  But the Department has developed acceptance criteria, including a high degree of purity for the elemental mercury the facility will accept.  The Department offered no explanation why differences among the generators of mercury would cause it to spend ten times more to manage the stored mercury, year in and year out as it sits at the storage facility.  Elemental mercury that is 99.5% pure and stored in qualified containers should be functionally identical for purposes of storing the containers.

59. The Fee Rule rests on numerous other logical, economic, and mathematical errors.

60. In addition, of the total charge, $24,500 represents the cost of treatment and disposal after 15 years of storage.

61. But the Department is not permitted to charge generators for post-storage treatment and disposal. MEBA details the kinds of costs that the Department's fee is supposed to cover, and those costs do not include treatment and disposal. The MEBA facility is for purposes of long-term *storage*, not disposal. The Department's charge of $24,500 for those purposes—nearly twice the amount it is charging for the storage itself—is contrary to law.

62. Coeur pointed this problem out in its comments on the NPRM. The Department's Fee Rule provides no response to that point; the Fee Rule does not even acknowledge that commenters had contended treatment and disposal are improper components for the fee. This issue is clearly important; the treatment and disposal charge is nearly two thirds of the total fee. The Department's failure to consider the issue is arbitrary and capricious.

63. The Department's estimate for the cost of disposal is also arbitrary and capricious. The Department assumes disposal in the United States will cost about $30,900 per metric ton. Commenters demonstrated that existing treatment and disposal options in Canada cost from about $22,000 to about $26,000 per metric ton. The Department did not adequately explain why its estimate for a hypothetical future disposal facility is more reliable than actual current costs from an operating facility.

64. The Fee Rule reveals that, as Coeur suspected based on the NPRM, the Department has indeed relied on important information that it did not disclose to the public with the NPRM. As one example, the Fee Rule says the Department conducted an analysis of the cost of disposal under the Department's Cost Estimating Guide, and the Department used that analysis to assess "preliminary pricing" that the Department had received. That analysis was, according to the Fee Rule, critical to the Department's reliance on the "preliminary pricing," because the analysis led the Department to conclude that the preliminary pricing was within the range of reasonable costs. But

the Department has never disclosed its Cost Estimating Guide analysis (and has also never disclosed the preliminary pricing information it says it received).

65. The Department failed in multiple other ways to provide adequate public notice and opportunity to comment as required by APA section 553.

66. The Fee Rule did not comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332. The Department's 2011 EIS, its 2013 supplemental EIS, and its 2019 supplemental EIS, along with the December 6, 2019 Designation, addressed only what facility the Department would use for long-term mercury storage. The Department has never assessed under NEPA the environmental impacts of a rule establishing a $37,000 per metric ton fee for storage. The Fee Rule is a major federal action, and its impacts are significant. Among other impacts, the storage fee is more expensive than having material treated for export to and disposal in Canada. For mercury generated in the future, generators will likely choose that less costly option. The predictable and foreseeable consequences of the Department's choices in the Fee Rule will include additional near-term treatment of mercury at facilities with that capability, transportation of that material to Canadian disposal facilities, and disposal there. The Department was obligated to acknowledge and consider those consequences, but it did not.

**The Task Order is Invalid**

67. The Department issued the Task Order to Waste Control Specialists to lease buildings at the company's west Texas site, which the Department will use as the long-term mercury storage facility, and to provide associated services for the management and storage of mercury there.

68. The Department has not conducted a procurement process for the Task Order in accordance with procurement laws.

69. The Department's Designation decision said it would rely on an existing basic ordering agreement ("BOA") with Waste Control Specialists. A BOA is not a contract and not an exception

to the competition requirements of federal procurement law.  The Department's BOA with Waste Control Specialists, entered in 2015, specifically states that it is "NOT a contract."  DOE Low-Level Mixed Low-Level Waste Treatment Services Basic Ordering Agreement, No. DE-EM0003716, § B.01, p. B-2 (Mar. 3, 2015).

70. The Department's indefinite delivery, indefinite quantity ("ID/IQ") contract with Waste Control Specialists, entered in 2017, does not encompass the lease of buildings, the storage of mercury, or the lease of buildings for storing mercury.  The ID/IQ contract is for treatment and disposal of low-level radioactive waste, not handling of bulk quantities of elemental mercury.

71. The Task Order is therefore outside the scope of any existing contract the Department has with Waste Control Specialists.

72. The Department has never issued a Request for Proposals to solicit competing bids for the long-term storage facility.  Nor has the Department asserted any proper exclusion to the requirement for competition in contracting.  The Department stated that Waste Control Specialists was "the only BOA awardee" capable of providing the required services.  But the Department is not authorized to restrict competition to "BOA awardee[s]."

73. The Department has not disclosed the Task Order or the prices or other terms that the Department agreed upon with Waste Control Specialists.

74. The Department has stated openly that it chose Waste Control Specialists for the specific purpose of "simplifying" the procurement process, such as by not engaging in competition.  This is not a permissible reason to give preference to a "BOA awardee."

75. Other facilities are potentially available, and the Department's 2019 supplemental EIS described several such facilities.  At least two companies besides Waste Control Specialists had expressed interest in providing the storage facility.

76. Generators are also storing their mercury, pending the Department's facility, at other facilities, including one operated by WM Mercury Waste, Inc., in Emelle, Alabama. Had the Department engaged in a competitive procurement process, it is likely that vendors other than Waste Control Specialists would have submitted bids.

77. Because the Department did not engage in a competitive process, its cost for the lease and for associated services at the WCS Site is at a price and on terms that did not result from a competitive process. Instead the price and terms are those negotiated at the Department's disadvantage (in part due to time constraints caused by the Department's own delays) with a company that the Department had repeatedly told—through the 2011 EIS, the 2013 supplemental EIS, the 2019 supplemental EIS, the January 2019 request for a proposal, and the December 6, 2019 Designation—was the preferred vendor.

78. MEBA section 5 directs the Department to designate a mercury storage facility and to consult with generators of mercury about the costs to be recovered from them for the operation of the facility.

79. Avoiding competition is contrary to the Department's responsibility under MEBA to develop a government facility for mercury storage and impose a fee sufficient to cover the costs of that facility. 42 U.S.C. § 6939f(a)-(b). The costs that the Department can impose under MEBA are only those that result reasonably from proper governmental operations. Inflated prices resulting from an acquisition that excluded interested potential offerors and gave preferential treatment to a single contractor are not a proper cost basis under MEBA.

**The Designation Is Invalid**

80. MEBA section 5 requires the Department to designate a facility for the long-term management and storage of elemental mercury. The December 6, 2019 Designation selected the WCS Site as that facility.

81. The Department gave only three reasons for that choice. One was that "the utilization of an existing Basic Ordering Agreement with WCS simplifies the procurement process and allows DOE to mitigate some of the liabilities associated with the incentives added to MEBA."

82. That reason was arbitrary and capricious, because the simplification of the procurement process was that the Department acquired the WCS Site and associated services by avoiding the full and open competition that was legally required. The notion that use of the BOA would simplify the procurement process in that manner was mistaken.

83. MEBA section 5 requires the Department to designate a facility "of the Department of Energy." Selecting the WCS Site was contrary to this requirement, because the WCS Site is not properly a facility of the Department. Buildings that the Department has purported to acquire through an unlawful, procedurally defective acquisition process are not facilities of the Department.

84. Designating a facility with inflated costs produced through a non-competitive acquisition process was arbitrary and capricious. The Designation did not consider, among the factors relevant to the decision whether to select the WCS Site, whether the costs associated with that site are reasonable.

### Standing

85. The Department has asserted that its mercury storage facility is now operational, thanks to its completion of the three actions challenged in this complaint: the Task Order, the Designation, and the Fee Rule. By operation of the certifications that MEBA required for a generator to use temporary storage, Coeur Rochester's accumulated mercury must now be delivered to the Department's facility and Coeur Rochester must pay the fee imposed by the Fee Rule.

86. That excessive fee is a direct injury to Coeur Rochester, flowing directly from these actions, that will be avoided if this Court invalidates the Fee Rule. Coeur Rochester therefore has standing to challenge the Fee Rule.

87. The contract with Waste Control Specialists is also a direct injury to Coeur Rochester.  The Task Order was one of the steps to make the facility operational, a development that would trigger the obligation to deliver existing mercury to the facility.  In addition, the excessive cost of the contract directly injures Coeur Rochester.  The Department is, as MEBA requires (except with respect to leases) passing the cost of the Task Order through to Coeur Rochester and other generators purportedly on a per-metric-ton basis.  If the Department were forced to engage in a proper competitive process to procure the facility and services, the result would likely be less costly, with lower costs then imposed on Coeur Rochester.  Coeur Rochester therefore has standing to challenge the Task Order.

88. Coeur Rochester has standing to challenge the Designation.  That decision was also a key step enabling the Department to accept mercury at the facility.  The choice of the WCS Site, without competitive bidding, has led the Department to accept excessive prices that Coeur Rochester will be forced to pay.

### Final Agency Action

89. The Fee Rule is a final action of the Department.  It is the Department's final decision regarding the fees to be charged, and it obligates any company delivering mercury for DOE storage to pay the amount stated in the rule.

90. The Task Order is a final action of the Department.  It is the Department's final decision to enter a lease for buildings at the WCS Site and to procure services to manage and store mercury there; and it has binding legal consequences for both the Department and Waste Control Specialists.

91. The Designation is a final action of the Department.  The Department presented it as a final decision fulfilling the statutory requirement (42 U.S.C. § 6939f(a)) that the Department designate a facility.  The decision has binding legal consequences for the Department and for mercury

generators, because the Designation is what permits the Department to use authority under MEBA section 5 to recover certain costs at the facility through fees charged to generators.

**Exhaustion**

92. Coeur participated in the limited comment process that the Department offered for the Fee Rule. In response to the NPRM, Coeur requested an extension; it notified the Department that the NPRM appeared to violate the APA's rulemaking requirements, and Coeur submitted comments raising the various issues it expects to present in this litigation.

93. Coeur had no opportunity to participate in the process leading to the Task Order. The Department negotiated the Task Order privately with Waste Control Specialists; it did not invite outside participation. There was no administrative process for Coeur to exhaust. Coeur did object to the non-competitive procurement process in its comments on the Fee Rule.

94. Coeur had no opportunity to raise in the process leading to the Designation its objection to a non-competitive procurement or the resulting costs. The Department last provided opportunities for public involvement regarding the Designation in a NEPA comment process years ago. During consultations with industry in 2018, the Department indicated it would be conducting a competitive procurement for the mercury storage facility. After the Department decided, instead, to restrict the opportunity to Waste Control Specialists, the Department offered no further opportunity for outside participation or input on its decision to designate the WCS Site.

**Count I: Judgment Vacating the Fee Rule.**

95. The foregoing paragraphs are hereby repeated and re-alleged.

96. The Fee Rule of the Department of Energy, entitled "Elemental Mercury Management and Storage Fees" and published in the Federal Register at 84 Fed. Reg. 70,402 (Dec. 23, 2019), is invalid:

    a. It is arbitrary and capricious;

b.  It is contrary to law;

c.  It was promulgated without observance of procedures required by law, including but not limited to the requirements of NEPA and the APA;

d.  The Department lacked substantial evidence for the rule.

97.  The Fee Rule is final agency action.

98.  Coeur has standing to contest the Fee Rule and is aggrieved by the rule, and Coeur has no adequate remedy in court other than an action under the APA.

99.  Coeur asks the Court to declare the Fee Rule invalid and vacate it.

### Count II: Judgment Invalidating the Task Order.

100.  The foregoing paragraphs are hereby repeated and re-alleged.

101.  On or about December 10, 2019, the Department issued the Task Order to Waste Control Specialists, to establish a lease for the Department on certain buildings at the company's west Texas site, to be used for the Department's long-term mercury storage facility; and for the company to provide services for management and storage of mercury at the site.

102.  The Task Order is final agency action of the Department.

103.  Coeur has standing to contest the Task Order and is aggrieved by it, and Coeur has no adequate remedy in court other than an action under the APA.

104.  The Task Order is contrary to law.  The Department used the Task Order to acquire property in violation of the requirements of federal procurement law.  The Department has not undertaken a competitive process or established a proper exception to the requirement of competition in procurement.  The Department purported to acquire the property and services through a task order under a basic ordering agreement, but basic ordering agreements do not exempt an acquisition from the requirement to obtain competition.

105.     The Task Order is arbitrary and capricious.  The Department's decision rests on, among other improper grounds, the irrational and incorrect assumption that the Department could avoid a competitive procurement process.  The Department concluded that no other "BOA awardee" could provide the requisite services, but it did not consider a key issue, namely whether other companies without basic ordering agreements could provide the services.  The Department failed to address the fact that at least two other companies had expressed an interest in the opportunity.

106.     The Task Order was issued without observance of procedures required by law, namely the procedures to obtain full and open competition.

107.     Coeur asks the Court to declare the Task Order invalid, vacate the Department's issuance of the Task Order, and enter appropriate relief to void the Department's contract under the Task Order.

## Count III: Judgment Invaliding the Department's Designation of the WCS Site as the MEBA Storage Facility.

108.     The foregoing paragraphs are hereby repeated and re-alleged.

109.     On December 6, 2019, the Department published the Designation selecting the WCS Site as its facility for long-term management and storage of elemental mercury.

110.     The Designation is final agency action of the Department.

111.     Coeur has standing to contest the Designation and is aggrieved by it, and Coeur has no adequate remedy in court other than an action under the APA.

112.     The Designation was arbitrary and capricious, because a key reason the Department gave was that choosing the WCS Site would allow it to simplify the procurement process by using a basic ordering agreement in place with Waste Control Specialists.  In fact, the Department was obligated to obtain full and open competition despite the existence of the basic ordering agreement, so that premise was incorrect.

113.     The Department failed to consider whether the costs arising from its use of the WCS

Site, given the circumstances under which it procured the Site and associated services, are

reasonable.

114.     Coeur asks the Court to vacate the Designation and require that the Department

decide afresh what facility to designate, after conducting a competitive procurement process.

### Count IV: Judgment Enjoining the Department From Operating Its Long-Term Mercury Storage Facility Until It Has Complied With Applicable Law.

115.     The foregoing paragraphs are hereby repeated and re-alleged.

116.     Coeur will demonstrate, and is likely to succeed in demonstrating, that the

Department's actions to implement MEBA are invalid.

117.     The operation of the facility during this litigation, and afterwards until the

Department takes proper action to develop a facility, will cause immediate and irreparable injury to

Coeur.  Under MEBA and the certifications under MEBA that allowed Coeur to store mercury

pending selection and operation of the DOE storage facility, Coeur must deliver its stored mercury

to the facility when the Department is able to accept it.

118.     Coeur has about 64 metric tons of mercury stored awaiting the availability of the

facility.  Delivering that mercury to the facility will mean removing it from the facility where it is

currently stored; loading it on trucks; and driving those trucks across the country to west Texas.  All

these steps will incur costs, as well as risks (such as accidents to the trucks transporting the bulk

quantities of elemental mercury), that cannot be undone or remediated if the Court determines that,

as Coeur maintains, the facility is not currently lawful.

119.     Absent an injunction, Coeur will be obligated to transfer its mercury to the

Department at the WCS Site and pay the Department's excessive $37,000 per metric ton storage fee.

Even if Coeur is able to recover that fee if the Fee Rule is invalidated, the mercury will be sitting at a

site in west Texas without authorization.  Coeur would then have to arrange to have the material

delivered back to some storage facility—assuming some facility would be willing to accept it—pending the proper development of a facility and adoption of a proper rule on storage fees.

120.    Being forced to move mercury back and forth across the country, at considerable cost and appreciable risk, constitutes irreparable injury.

121.    The APA permits the Court to issue appropriate temporary relief to pause the implementation of a rule pending judicial review, and to issue appropriate permanent relief for improper agency action.  A pause on operation of the Department's mercury storage facility pending judicial review would be a sound exercise of the Court's discretion.

122.    Any harm to the Department from a preliminary injunction will not outweigh the harm to Coeur from allowing DOE to assess exorbitant fees against Coeur and allowing the facility to operate.

123.    The balance of interests favors a preliminary and a permanent injunction.  The Department has had over a decade to develop the facility that MEBA first mandated in 2008.  The public interest favored the Department's compliance with the law by meeting the original deadlines, and then by meeting the statute's adjusted deadlines.  The Department's last-minute race to finish its work before the end of 2019 does not deserve the Court's solicitude.

124.    Coeur requests preliminary and then permanent relief barring the operation of the facility until the Department engages in a proper procurement process or otherwise lawfully acquires and designates a facility and until the Department issues a proper rule establishing storage fees.

### Prayer for Relief

Wherefore, Coeur respectfully requests that this Court provide the following relief:

(1)  Judgment vacating the Fee Rule;

(2)  Judgment voiding the Department's contract with Waste Control Specialists for a lease and for services to manage and store elemental mercury;

(3)  Judgment vacating the Department's designation of the WCS Site as the facility required by MEBA for long-term management and storage of mercury;

(4)  Judgment enjoining the Department's operation of the WCS Site as such a facility unless and until the Department properly implements the MEBA facility there;

(5)  Reasonable costs and attorneys' fees, to the extent permitted by the Equal Access to Justice Act or other applicable law; and

(6)  Such other and further relief as the Court concludes is appropriate.


Dated this 31st day of December, 2019.

*/s/ Keith Bradley*
Keith Bradley, Atty. Reg. 252505
Carolyn L. McIntosh (*pro hac vice motion to be submitted*)
Alexander Arensberg (*pro hac vice motion to be submitted*)
Darin J. Smith (*pro hac vice motion to be submitted*)
SQUIRE PATTON BOGGS (US) LLP
1801 California St., Suite 4900
Denver, CO 80202
Telephone: (303) 830-1776
E-mail: keith.bradley@squirepb.com
carolyn.mcintosh@squirepb.com
alexander.arensberg@squirepb.com
darin.smith@squirepb.com

*Attorneys for Plaintiff*
